[No. 27689-1-I.   Division One.   July 6, 1992.]

RUBY THWEATT, *Respondent*, v. ROBERT HOMMEL, *Appellant*.

*Steve H. Demarest* and *Demarest & Associates,* for appellant.

*Richard R. Beresford* and *Beresford, Booth, Baronsky & Trompeter,* for respondent.

KENNEDY, J. — Robert Hommel appeals an award of usury penalties equal to the principal balance due from Ruby Thweatt on a $30,000 promissory note and the trial court's judgment requiring him to repay the interest he had received and to pay Thweatt's attorney fees incurred in pursuit of her usury claim. Because we conclude that the loan qualified for the business purpose exemption provided by RCW 19.52.080, we reverse and remand for entry of judgment in favor of Hommel on his counterclaim for judicial foreclosure of the deed of trust securing the note.

## FACTS

We will discuss the facts only insofar as they are relevant to the dispositive issue on appeal.[1] M.L. Aaenson, a journeyman electrician and Ruby Thweatt's live-in companion at the time of the loan, desired to purchase the assets of John Carlson's electric company. Aaenson was employed as Carlson's store manager. Aaenson, who had attended a "get rich quick" real estate investment seminar also wished to purchase, fix up and rent or resell some houses. In April 1986, after Aaenson responded to a newspaper advertisement placed by Forbes Financial Services[2] offering home equity loans with "no credit check", Aaenson and Thweatt signed a "preliminary commitment for a commercial loan" to be secured by a lien on Thweatt's home in Bothell, Washington. Forbes Financial Services then listed the loan in its

---

[1]Because our determination that the loan qualified for the business purpose exemption is dispositive, we need not discuss the other issues raised by the appellant and respondent, except for Hommel's request to be awarded his attorney fees for this appeal.

[2]Forbes Financial Services is also sometimes referred to as "Forbes Equities", or simply as "Forbes".

bulletins which were circulated to prospective lenders. Forbes attracted prospective lenders by way of newspaper advertisements, as well as prospective borrowers.

Robert Hommel, a merchant seaman who was approaching retirement, desired to invest his savings in the hope of improving his retirement security. He responded to a newspaper advertisement placed by Forbes Financial Services, and began to receive the company's bulletins. In May and June 1986, the Thweatt-Aaenson listing was as follows:

> $40,000 2nd DOT, 18% interest rate for 12 months; monthly interest payment $600. Underlying first of $30,000. Market value $117,500; assessed value $90,000. Clean larger split level home in lovely semi-rural Bothell area. Borrower self-employed journeyman electrician (12 years) expanding business.

Hommel, after seeing the listing, offered to invest $30,000 into this loan.

On July 3, 1986 (a Thursday), Thweatt and Aaenson signed a $30,000 promissory note payable to Hommel, agreeing to pay 18 percent interest, compounded monthly, for 1 year. The note called for monthly payments for interest only of $450 per month and a balloon payment of the entire principal balance on July 3, 1987. After default the note called for interest at the rate of 35 percent. Thweatt and Aaenson also signed a deed of trust on Thweatt's home to secure the note. Each of them also signed a notarized "affidavit for business purposes", stating that the purpose of the loan was "[t]o Purchase Rental & Investment Properties and to Purchase Electrical Service Van and Equipment. M.L. Aaenson and Electric Co." Richard Williams, the president of Forbes Financial Services, obtained the coborrowers' signatures and served as the notary. Hommel was not present when this occurred. Williams, who was to serve as the escrow holder, took delivery of the loan documents.

Also on July 3, 1986, Hommel signed his approval onto the promissory note and onto the deed of trust. On that same day he delivered into escrow a cashier's check for $30,000 payable to "Forbes Real Estate Escrow Trust Account".

It is undisputed that as of July 3, 1986, when the loan documents were executed and delivered into escrow and when the loan proceeds were delivered into the escrow trust account, the actual and intended purpose of the loan was to purchase the assets of John Carlson's electric company.[3] All that remained to be done, by the end of the business day on July 3, 1986, was to record the deed of trust and prepare and deliver the check for the loan proceeds. Forbes was instructed to make the check for the loan proceeds payable to "M.L. Aaenson Electric Company".

At some point over the ensuing 3-day Independence Day holiday weekend, John Carlson told Aaenson he had decided not to sell the assets of his electric company, but instead to remain in business.

On Monday, July 7, 1986, Forbes delivered to Aaenson its trust account check number 1028, made payable to "M.L. Aaenson Electric Company", for $25,403.09.[4] Aaenson took the check to a bank and attempted to cash it. The bank declined to cash the check. Aaenson's account as to why the bank declined to cash the check is somewhat confusing. At one point he stated that the bank wanted two signatures on the check. At another point, the problem seemed to be that because the check was made out to "M.L. Aaenson Electric Company", a nonexistent business, the check could not be cashed. In any event, Aaenson returned the check to Forbes Financial Services and asked to have the check reissued to Aaenson individually.

At some point before the check was reissued, Aaenson met with Williams at a Denny's Restaurant and told him he would not be purchasing the electric company assets after

---

[3]At a later time and in a transaction unrelated to this one, Aaenson borrowed an additional $15,000 which he invested into a duplex in Everett. Neither Thweatt nor Hommel were parties to that loan.

[4]A $3,600 loan fee and various charges for title insurance, the recording fee and other closing costs were deducted from the loan proceeds. The trial court found that Forbes had served as the borrowers' agent in procuring the loan. Accordingly the loan fee was properly chargeable to the borrowers. No appeal has been taken from this ruling.

all. The trial court found that Aaenson told Williams he wished instead to use the money for "some other non-specific purposes." Findings of fact 14, 16.

On Tuesday, July 8, 1986, Forbes recorded the deed of trust and reissued the loan proceeds, this time by way of a cashier's check made payable to "M.L. Aaenson". On the face of the cashier's check the words "Re: Replace Check 1028" were imprinted. Ruby Thweatt was not told the check had been reissued payable to Aaenson personally. Robert Hommel was not told the check had been reissued payable to Aaenson personally.

Aaenson then deposited the cashier's check into his own personal account. Aaenson used the funds to pay personal expenses and debts for himself and Ruby Thweatt.[5]

Aaenson made the monthly interest payments on the promissory note, commencing in August 1986, and continuing through August 1987. The balloon payment for the principal balance, which fell due on July 3, 1987, was not paid. Aaenson sought a 6-month extension, which Hommel granted on condition that Aaenson, who habitually had been late with the monthly payments, make all the extended schedule of payments on time. Aaenson made no further monthly payments after August 1987. Thweatt and Aaenson separated. Thweatt lacked sufficient income to make the monthly payments. Neither Aaenson nor Thweatt was able to meet the balloon payment.

Hommel then commenced a nonjudicial foreclosure pursuant to the deed of trust. Before the date scheduled for the trustee's sale, Thweatt sought a judicial stay of the trustee's sale and instituted these proceedings, claiming usury, and raising other claims which are not relevant to this appeal. Hommel then voluntarily discontinued the nonjudicial fore-

---

[5]Ruby Thweatt's complaint against Robert Hommel included a claim for breach of contract by virtue of Williams, who the trial court found to be Hommel's agent by this stage of events, having reissued the loan proceeds to Aaenson without her consent. Thweatt claimed she received no personal benefit from the loan proceeds. The trial court ruled that Thweatt failed to carry her burden of proof that this was so. No error has been assigned to that ruling.

closure and filed a counterclaim for judicial foreclosure. In due course, the matter proceeded to trial.

■ The parties stipulated at trial that the loan is usurious unless it qualifies for the business purpose exemption pursuant to RCW 19.52.080. Because the note is usurious on its face, Hommel bears the burden of proving that the loan qualifies for the business purpose exemption. *Stevens v. Security Pac. Mortgage Corp.*, 53 Wn. App. 507, 514, 768 P.2d 1007, *review denied*, 112 Wn.2d 1023 (1989).

■ The trial court found that Richard Williams, the president of Forbes Financial Services, had been the agent of Thweatt and Aaenson until July 3, 1986, when the loan documents were signed by the coborrowers, and that thereafter Williams became the agent of Hommel. Hommel, whose work as a merchant seaman required him to be away at sea for months at a time, contracted with Forbes to serve as his collection agent for the note payments and to enforce the note by proceeding against the security if that should become necessary. No error has been assigned to these agency findings and they are verities for purposes of this appeal.[6]

Because Williams was Hommel's agent at the time Aaenson told Williams the purpose of the loan had changed, and because this knowledge was acquired by Williams before the loan proceeds were finally disbursed (in the words of the trial court, before the loan was "closed"), the trial court concluded that the knowledge of the changed purpose must be imputed to Hommel and that the notification of changed purpose "resulted in the loan no longer qualifying for the business purpose exemption provided by RCW 19.52.080." Finding of fact 14. See also finding of fact 16.[7]

---

[6]Sometime prior to trial Forbes Financial Services apparently went out of business. Testimony at trial indicated that Richard Williams had "disappeared". M.L. Aaenson is not a party to this lawsuit. He was, however, a witness at the trial. Neither Richard Williams nor Forbes Financial Services is a party to this lawsuit.

[7]Although labeled as a finding of fact, the trial court's determination that the loan no longer qualified for the business purposes exemption is actually a conclusion of law. For purposes of review, we therefore treat the finding as what

After applying the statutory formula for computing the usury penalty, *see* RCW 19.52.030(1), and treating the penalty as an offset against the principal balance due on the note, the court determined the balance due Robert Hommel to be zero.

The trial court concluded that RCW 19.52.030(1) entitled Ruby to receive her costs of $1,038; her reasonable attorney fees (apportioned to the usury claim) of $5,840 and the interest paid by the coborrower Aaenson on the note of $5,850; for a gross sum of $12,728. Robert Hommel was granted an offset of $5,510 for the sum he had paid to the holder of the first deed of trust on Ruby's home, in order to protect his second position after Thweatt fell behind in her house payments.[8] The trial court specifically concluded that, but for the finding of usury, Hommel would be entitled to judgment in accord with his counterclaim, in that the promissory note and deed of trust were otherwise valid and enforceable. Judgment was entered in favor of Thweatt for the net sum of $7,218, bearing interest at 35 percent in accord with RCW 19.52.030(1).

This appeal followed. Hommel assigns error to the trial court's conclusion that the loan does not qualify for the business purpose exemption provided by RCW 19.52.080. He seeks to be awarded his reasonable attorney fees, below and for this appeal.

DISCUSSION

I

Business Purpose Exemption

Hommel argues that the disclosure made by Aaenson to Williams of the changed purpose of the loan came after the relevant point of inquiry and that since this loan had a legitimate business purpose when it was procured and contracted for, the business purpose exemption applies. We agree.

---

it really is, a conclusion of law. *See Para-Medical Leasing, Inc. v. Hangen*, 48 Wn. App. 389, 397, 739 P.2d 717, *review denied*, 109 Wn.2d 1003 (1987).

[8]The holder of the first deed of trust had instituted a nonjudicial foreclosure. Hommel reinstated that loan in order to protect his position.

■ Although the business or personal nature of a loan is a factual question, *McGovern v. Smith*, 59 Wn. App. 721, 731, 801 P.2d 250 (1990), the determination of whether RCW 19.52.080 applies to a given factual situation is a question of law. *Pacesetter Real Estate, Inc. v. Fasules*, 53 Wn. App. 463, 471, 767 P.2d 961 (1989).[9]

■ If usury does not exist at the inception of a loan contract, the loan is not usurious. *National Bank of Commerce v. Thomsen*, 80 Wn.2d 406, 410, 495 P.2d 332 (1972). *See also Aetna Fin. Co. v. Darwin*, 38 Wn. App. 921, 927, 691 P.2d 581 (1984), *review denied*, 103 Wn.2d 1019 (1985) ("[B]orrower's intended use for the loan proceeds must be characterized according to manifestations of intent, if any, that the borrower made to the lender at the time the parties entered into the loan contract.").

In *Brown v. Giger*, 111 Wn.2d 76, 757 P.2d 523 (1988), the Supreme court, referring to *Aetna Fin. Co. v. Darwin, supra,* stated:

> We fully concur with the *Aetna* court that a loan's "purpose" in the context of RCW 19.52.080 is principally established by the representations the borrower makes to the lender at the time the loan is *procured*.

(Italics ours.) 111 Wn.2d at 82.

In *Brown v. Giger, supra,* the Supreme Court, after noting that the lender's agent had a reasonable basis for concluding, during the loan interview, that Giger and her friend were business partners, and after noting that Giger had, in three separate loan documents, described the loan as having a business purpose, stated:

> This is not to say that objective manifestations of purpose are always determinative of the applicability of the "business purpose" exemption. Courts will not deny a borrower his protections against usury when a lender manipulates a loan's structure so as to evade usury restrictions. Thus, where it appears that the objective evidence of a loan's purpose has been "rigged" by the lender, further scrutiny into the borrower's actual purpose in obtaining the funds may be necessary. We are not faced with this situation here, however.

---

[9]See footnote 7.

> Moreover, nothing suggests that Giger was "by adversity and necessity . . . driven to borrow money at any cost."

(Citations omitted.) 111 Wn.2d at 83.[10]

Here, the Thweatt-Aaenson loan was *truly* for a business purpose when the loan was procured and when the loan documents were signed by the borrowers and approved by the lender and when the loan proceeds were placed into the escrow trust account, thus funding the loan. Here, like *Brown v. Giger, supra,* there was no "rigging" of the loan documents in order to provide objective evidence of a nonexistent business purpose.

Although it might be said (and was said by the trial court) that this loan had not "closed" at the time Aaenson revealed his changed purpose to Williams, in that the deed of trust had not yet been recorded and the loan proceeds had not yet been finally disbursed, by the end of the business day on July 3, 1986, this loan transaction was completed for all other purposes. Hommel had done all that he was required to do. Thweatt and Aaenson had done all that they were required to do. There only remained the ministerial acts of recording the deed of trust and disbursing the loan proceeds. When the 3-day holiday weekend commenced, necessarily delaying the recording of the deed of trust, this loan had a genuine business purpose. The loan proceeds were initially disbursed before the notification was given, although the proceeds were reissued thereafter. Under these circumstances, we hold that the loan qualifies for the business purposes exemption provided by RCW 19.52.080, notwithstanding the subsequent change in Aaenson's subjective purpose for the loan, and notwithstanding that Aaenson told Williams of Aaenson's changed purpose, before the deed of trust was recorded and before the loan proceeds were finally disbursed.

---

[10]The court was quoting from *Baske v. Russell,* 67 Wn.2d 268, 273, 407 P.2d 434 (1965). Washington's usury statutes are designed to protect the needy borrower from the unconscionable moneylender. This protection is based on the fact that many borrowers are unable to resist the avarice of moneylenders. *Baske,* at 273; *Giger,* at 79. Here, as in *Brown v. Giger, supra,* Aaenson and Thweatt were not driven by adversity and necessity to borrow money at any cost.

■ RCW 19.52.080 provides that the defense of usury may not be pleaded if the "transaction" was primarily for a business purpose. The term "transaction" is not defined in the statute. Accordingly, we look to a standard dictionary for the common meaning of the term. According to *Webster's Third New International Dictionary* 2425-26 (1976) a "transaction" is:

> a communicative action or activity involving two parties or two things reciprocally affecting or influencing each other . . . a business deal . . ..

Here the parties entered into a business deal, the terms and provisions of which were reduced to writing, executed by both parties, and delivered into escrow. The money to fund the loan was also delivered into escrow. There were no remaining conditions to be met in order to disburse the funds except to record the deed of trust, a ministerial act.[11] We find no indication from the loan documents, the closing statements, the verbatim report of the trial proceedings, the trial court's memorandum decision, or the findings of fact and conclusions of law that there was any reason whatsoever for the delay in recording the deed of trust and disbursing the loan proceeds except for the intervening 3-day holiday weekend.

Hommel argues that because a lender cannot oversee the expenditure of the loan proceeds to verify a business purpose, the courts must look to the true purpose of the loan at the time it was procured, that is, at the inception of the loan, to determine whether the business purpose exemption applies. Thweatt argues that because Williams knew he was reissuing the check for a nonbusiness purpose, and because Williams was serving as Hommel's agent at that time, Hommel is deemed as a matter of law to have ratified the making of the loan for a nonbusiness purpose.

---

[11]The loan proceeds were initially disbursed by the delivery of the trust account check on July 7, 1986, before the deed of trust was recorded. Then on July 8, 1986, the deed of trust was recorded and the loan proceeds were reissued. There is no explanation in the record of why the loan proceeds were initially disbursed before the deed of trust was recorded.

■ Although we have considerable doubt that because Hommel retained Williams to collect and enforce the note this necessarily gave Williams the apparent authority to agree to a material change in the terms of the transaction,[12] and although we tend to agree with Hommel that this loan should be for all practical purposes, if not in the strict, technical sense, considered "closed" as of the end of the business day on July 3, 1986, the underlying agency issues and the technicalities of when a loan may be considered "closed" as a matter of law, have not been briefed for this appeal. Accordingly, we do not rest our decision on those premises. Rather, we hold that under the peculiar facts of this case the loan transaction between the parties qualifies for the business purposes exemption because this loan was for a legitimate business purpose when the loan was procured and when the contract was entered into. As pointed out by Hommel, RCW 19.52.080 does not require that the loan proceeds actually be used for a business purpose and a lender is not required to oversee the uses to which the loan proceeds are put in order to preserve the business purpose exemption. Just as a borrower might secretly have a non-business purpose in mind from the inception, as in *Stevens v. Security Pac. Mortgage Corp.*, 53 Wn. App. 507, 768 P.2d 1007, *review denied*, 112 Wn.2d 1023 (1989), he or she may change his or her mind about the use of the funds after the deal is made. We find no requirement in RCW 19.52.080 that a lender who has entered into a transaction which legitimately qualifies for the business purposes exemption is required to rescind the contract, if he learns the borrower subsequently has changed his or her mind about the use of the funds. Thus, we need not decide whether Hommel could have rescinded this contract on July 7 or 8, 1986, had he known of Aaenson's change of mind. We hold that Hommel

---

[12]*See, e.g.*, Restatement (Second) of Agency § 50 comment *b*, § 14D (1958); *see also Hendricks v. Lake*, 12 Wn. App. 15, 23, 528 P.2d 491 (1974), *review denied*, 85 Wn.2d 1004 (1975) (an agent's knowledge is not to be imputed to a principal where the agent acts outside the scope of his duties or not for the benefit of the principal).

was not *required* to do so. He is entitled to the benefit of the bargain which was made on July 3, 1986. To rule otherwise would be tantamount to placing a requirement upon lenders to condition the "closing" of a loan upon the borrower making additional assurances that a loan which was for a legitimate business purpose when the escrow account is opened is still for that same purpose when the escrow account is closed, particularly if, as here, by reason of an intervening 3-day weekend, there must be a delay in "closing" the loan. Any such requirement should come from our Legislature, so that lenders and escrow holders might be fully apprised, in advance, of any such additional requirements before venturing to "close" a loan transaction, and not from the courts.

## II
## Attorney Fees

■ Hommel seeks to be awarded his attorney fees, below and for this appeal. Paragraph 4 of the deed of trust provides that the grantor shall pay attorney fees in a reasonable amount for any suit brought to foreclose the deed of trust. RCW 19.52.032 provides that if a debtor who seeks to establish that a loan is usurious fails in the effort, and if the court finds the action was frivolously commenced, the lender may, in the court's discretion, recover reasonable attorney fees from the debtor. In *Aetna Fin. Co. v. Darwin*, 38 Wn. App. 921, 930, 691 P.2d 581 (1984), *review denied*, 103 Wn.2d 1019 (1985), a case in which the lender did *not* prevail, the court held that the provisions of RCW 19.52.030(1) prevail over other statutory provisions or those contained in the loan agreement. Here, although Hommel has prevailed, Thweatt's usury claim was not frivolous.[13] By the reasoning in *Aetna Fin. Co. v. Darwin, supra,* there is at least an arguable issue that RCW 19.52.032 may override the provision contained in the loan agreement by which

---

[13]Hommel has argued in this appeal that Thweatt's usury claim was time barred pursuant to RCW 19.52.032, an issue we were not required to reach but one we would have decided against Hommel if it had been reached. *See Flannery v. Bishop*, 81 Wn.2d 696, 504 P.2d 778 (1972).

Hommel would ordinarily be entitled to his attorney fees. Because Hommel did not prevail below, this issue has never been argued to the trial court. Further, although Hommel seeks to be awarded his attorney fees on appeal, he has done so without any argument in his brief. RAP 18.1(b) requires more than a bald request for attorney fees on appeal. Where there is any issue whatsoever as to a party's entitlement to attorney fees, the failure to argue the issue requires us to deny the request, at least insofar as the appeal is concerned. Although we deny Hommel's request to be awarded his attorney fees on appeal, we do so without prejudice to Hommel's right to request the trial court, after remand, to award him his reasonable attorney fees for the foreclosure proceeding below. We express no opinion as to whether RCW 19.52.032 may override the basis upon which Hommel would ordinarily be entitled to an award of his reasonable attorney fees, leaving this issue to be developed and briefed for the trial court's determination.

## CONCLUSION

In conclusion, we reverse the trial court's judgment in favor of Thweatt and remand for entry of judgment in favor of Hommel on his counterclaim for judicial foreclosure and for a determination of whether Hommel is entitled to an award of his reasonable attorney fees for the proceedings below. We deny Hommel's request to be awarded his attorney fees for this appeal.

WEBSTER, A.C.J., and AGID, J., concur.

Review denied at 120 Wn.2d 1016 (1992).